STATE OF CONNECTICUT *v.* RICARDO MILLS
(AC 17986)

Landau, Spear and Vertefeuille, Js.

Argued October 21, 1999, officially released April 4, 2000

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Edward Ricciardi*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SPEAR, J. The defendant, Ricardo Mills, appeals from the judgment of the trial court, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3)[1] and assault in the first degree in violation of General Statutes § 53a-59 (a) (3).[2] The defendant claims that the court improperly (1) denied his motions for a mistrial and a new trial, which alleged prosecutorial misconduct in closing arguments and (2) denied his motion to suppress evidence seized pursuant to an allegedly unlawful warrantless arrest. We reverse the judgment of the trial court because of prosecutorial misconduct, affirm the ruling on the motion to suppress and remand the case for a new trial.[3]

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[3] The defendant also claims that his conviction of reckless manslaughter in the first degree and reckless assault in the first degree violate his federal and state constitutional guarantees against double jeopardy. U.S. Const., amends. V, XIV; Conn. Const., art. I, § 9. We need not address this claim because (1) we do not know if the defendant will be convicted of either or both charges in the new trial and (2) even if he is again convicted of both charges, the state and the defendant agree that double jeopardy could be avoided by the trial court vacating one sentence and combining the convic-

The jury reasonably could have found the following facts. On September 16, 1996, the victim, Ralph Hickey, and several other persons were visiting Laura Blumberg and James Blumberg in Waterbury. At approximately 6:30 p.m. that evening, the defendant, who was known to the Blumbergs, knocked on the door of their apartment. The defendant, after being invited in by James Blumberg, walked straight over to the victim. After the defendant and the victim began arguing about an incident involving the defendant's dog, the defendant punched the victim in the face and a scuffle ensued. During the struggle, the defendant picked up a knife and stabbed the victim several times.[4]

Shortly after the fight, the victim left with Laura Blumberg to go to Southbury. During the trip, the victim began to suffer the effects of the several stab wounds, and he decided to drive into the Southbury Food Center parking lot in Southbury. Police and medical personnel were called, and they transported the victim to St. Mary's Hospital in Waterbury, where he died the next morning.

The jury found the defendant guilty of one count of manslaughter in the first degree and one count of assault in the first degree. This appeal followed.

I

The defendant first claims that the prosecutor made numerous improper statements during closing argu-

tion in accordance with *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

[4] None of the witnesses ever saw a knife being used during the fight. The defendant also testified that he did not know the victim was cut during the fight. The jury, however, reasonably could have found, on the basis of the medical examiner's report, that the defendant did cut the victim. The report indicated that there were four stab wounds. The wounds were to the victim's right lower chest, abdomen, right buttock and left upper back. The cause of death was certified as a "stab wound of the chest/abdomen."

ment that were so egregious that they deprived him of his constitutional right to a fair trial pursuant to the fifth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut.[5] We agree.

" '[Our Supreme Court has] previously acknowledged that prosecutorial misconduct can occur in the course of closing argument.' *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996)." *State* v. *Satchwell*, 244 Conn. 547, 564, 710 A.2d 1348 (1998). "Such argument may be, 'in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact.' *State* v. *Fullwood*, 194 Conn. 573, 585, 484 A.2d 435 (1984)." *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987).

To review a claim of prosecutorial misconduct during closing argument, "we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) Id. "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, [our Supreme Court] in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the

---

[5] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id., 540. With these factors as a guide, we now review whether the prosecutor's conduct denied the defendant a fair trial.

The record in this case discloses a pattern of misconduct during closing argument that was in no way invited by the conduct or argument of the defense. The severity and frequency of the conduct is demonstrated by the fact that the prosecutor continued on his improper course after successful objections by defense counsel.[6] The state's case in support of the original murder and assault charges was relatively weak. The numerous requests for reinstruction show that the jury had difficulty reaching its decision. Although the defendant was convicted of two lesser offenses, this does not excuse the prosecutor's conduct.

The prosecutor's actions were so severe that he was admonished by the court outside the hearing of the jury.[7] In his misguided zeal to convict the defendant, the prosecutor improperly expressed his personal opinions, appealed to the passions and emotions of the jurors, and injected extraneous matters into the case.

---

[6] Defense counsel objected to improper statements on three occasions during the state's initial closing argument and twice during the state's rebuttal argument. The court sustained two of the first three objections and one of the two made during rebuttal argument. The court instructed the jury to disregard the particular arguments after two of the sustained objections. The court also gave a curative instruction during its charge to the jury. At the end of the state's rebuttal argument, the defense made an oral motion for a mistrial, which the court denied. After trial, the defense again renewed the claim in a request for a new trial, and again this motion was denied.

[7] After closing arguments were completed and the jury was escorted out of the courtroom, counsel for the defense made an oral motion for a mistrial on the basis of prosecutorial misconduct. The court responded: "Well, I don't know what's in the water in Waterbury, but I have tried to tell prosecutors and people to be calm, reason, think about what they are saying. [The state's attorney] on a few occasions, did approach that bridge."

## A

## Expression of Personal Opinion

The prosecutor may not express his opinion, directly or indirectly as to the defendant's guilt. *State* v. *Williams*, supra, 204 Conn. 541. "Such expressions of personal opinion are a form of unsworn and unchecked testimony." Id. Furthermore, it is not the state's attorney's right or duty to stigmatize a defendant. *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

In his closing and rebuttal arguments, the state's attorney improperly gave his personal opinion on numerous occasions. First, he expressed his opinion that society would be in trouble if the defendant were not found guilty of murder.[8] The prosecutor also attempted to stigmatize the defendant by constantly referring to his acts as vicious or heinous, and by suggesting that the word "back-stabber" was coined because of people such as the defendant.[9] During his initial closing and again in his rebuttal, the prosecutor stated that justice would require a murder conviction.[10]

---

[8] The prosecutor stated: "It's murder, murder based on an unprovoked attack of a man sitting at a table, minding his business. If we allow this to happen, we are all in trouble. If—we could be in somebody's house and somebody—minding our business, somebody can come in and stab . . . ."

[9] The prosecutor stated: "This is Ralph Hickey. He had life, like you. He doesn't have it now. This man took it. Took it in a cruel, vicious, heinous attack. You heard the term back-stabber. I guess we know where that comes from. This is a murder, intentional, heinous, knife-wielding, vicious attack."

[10] First the prosecutor stated: "This case—justice in this case requires a murder conviction and no less."

Next the prosecutor stated: "In this case, the state of Connecticut wants justice. And Mr. Hickey wants justice. I can't go back there with you. But justice requires a conviction for murder."

Finally, in his rebuttal, the prosecutor stated: "State of Connecticut wants justice. Justice requires a conviction for murder. And I don't say it lightly, but it does. And justice requires for Ralph Hickey a conviction for murder."

The prosecutor also emphatically gave his opinion that the police had done good work in getting their man.[11]

"These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. *State* v. *Ferrone*, [96 Conn. 160, 168–69, 113 A. 452 (1921)]. The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence; *United States* v. *Modica*, [663 F.2d 1173, 1178–79 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982)]; which the jury may infer to have precipitated the personal opinions." *State* v. *Williams*, supra, 204 Conn. 542–44. "As we stated in *State* v. *Ferrone*, [supra, 168–69,] '[b]y reason of his office, [the prosecutor] usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment.' " *State* v. *Couture*, supra, 194 Conn. 564–65. The prosecutor is held in high esteem by the jury because " '[h]e is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . .' *State* v. *Ferrone*, [supra, 168–69]." *State* v. *Williams*, supra, 537–38.

The prosecutor's repeated appeals to the jury that justice required a conviction coupled with the repeated vitriolic references to the defendant could reasonably have been a factor in the jury's decision to convict. His

[11] The prosecutor stated: "Police had a killer. They knew who it was. They had witnesses. And they did what they were supposed to do, exactly what they were supposed to do and no less. And we would demand no less. They knew what was done. They knew where it was done. They knew how it was done. And they knew who did it. And they went and apprehended him. It's good police work. It's damn, fine, good police work."

opinion that society would be in trouble if the defendant were not convicted might also have played a part in the jury's decision to convict because of a fear that the defendant might strike again if acquitted.

## B

### Appeals to Emotion

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Citations omitted; internal quotation marks omitted.) Id., 545. "When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." Id., 546.

In this case the prosecutor improperly appealed to the emotions and sympathies of the jury on several occasions. In one such appeal, he asked that the jury not victimize the victim again.[12] Later in his rebuttal argument, he appealed to the jurors to convict so that evil would not triumph by their inaction.[13] By using such dramatic words, the prosecutor was attempting to color the jurors' minds with such emotion that they would consider it their duty to convict regardless of the evi-

---

[12] The prosecutor stated: "The fact that the victim didn't go to the hospital or was negligent—even if you think he is negligent in not going to the hospital, it's of no merit. Proximate cause, cause of death, stabbing. By who? Him, nobody else. So, don't go back there and victimize Ralph Hickey twice . . . ."

[13] The prosecutor stated: "I want to say one thing in closing, closing/closing, just paraphrase a little, all that it needs for evil to triumph is for good men and women—

"[Defense Counsel]: Objection.

"[Prosecutor]:—to do nothing.

"The Court: Sustained, sustained. Disregard that particular argument, ladies and gentleman."

dence. On occasions throughout the prosecutor's closing argument, he spoke the victim's name with such repetition and used such strong, inappropriate language that it could only be inferred that his intent was to appeal to the sympathies and emotions of the jury.[14]

## C

### Injection of Extraneous Matters

"[A] prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . It is improper for the prosecutor to encourage the jury to identify with the victim and to predict the effect of a not guilty verdict . . . ." (Citation omitted.) Id., 547. Although in *Williams*, the victim was not killed, the rationale for precluding such an appeal to the jury is the same and should not be countenanced.

In this case, the prosecutor consistently encouraged the jury to identify with the victim. He argued that "[y]ou [the jury] wake up, you're in a cold sweat. What's wrong, what's wrong, what's wrong? Had a nightmare? What was the nightmare? Being accosted by a knife-wielding assailant. There he is. That's the nightmare that Mr. Hickey, Ralph Hickey, lived. The only difference is, you wake up from your nightmares. Ralph Hickey isn't ever going to wake up from his, ever." In his continuing effort to persuade the jury to identify with the victim, the prosecutor argued that the jury should not victimize

[14] The prosecutor stated: "Ralph Hickey, ladies and gentlemen, Ralph Hickey, Ralph Hickey, Ralph Hickey, Ralph Hickey. You know what happens in courts? Not in this court, not in this state's attorney's office, Ralph Hickey is not going to be a nameless, faceless, slab of meat on an autopsy table, forgotten. He is not. This is Ralph Hickey. He had life, like you. He doesn't have it now."

The prosecutor later stated: "And the damn case is about Ralph Hickey. That's another little thing we try to get done here, you know. Forget about the victim, just forget about him. Don't forget about him. Damn it, don't forget about him."

him twice, that the victim wants justice, that the victim is not a "slab with a toe tag," that he could not come today to court and tell his story, and that "justice requires for Ralph Hickey a conviction for murder."

We have scrutinized the entire record of this case. There is no evidence suggesting that the prosecutor's misconduct was invited by the defense conduct or argument. The errors were severe and frequent, and bore directly on the defendant's guilt or innocence. The court did, however, give curative instructions directing the jury to disregard the improper argument.[15]

---

[15] The court stated in relevant part during its charge to the jury: "There's been some testimony that's been excluded or stricken by me. You are not to consider that. In final arguments, I sustained objections or told you not to—or to ignore and strike certain parts of arguments. And you are to do so. And I will remind you of what they were in just a moment. . . .

"I have to take a moment now just to make some observations for you. [The prosecutor], in his final argument to you, was quite exuberant, shall we say. What happens when people become exuberant, they sometimes misspeak. I think, as you—frankly, some curse words were inappropriate. But there are other things that concern me a bit more. And I just want to make sure that you understand what the realities of this situation are.

"Again, exuberance, sometimes people get carried away. He made some references that I want to repeat to you, so that you will not use them. Okay. He talked about a nightmare. Forget about that argument. In that analogy, it's not appropriate in this particular case. He talked about the victim being victimized twice. That is inappropriate. He said it in exuberance, I am sure, but that's not an argument to be made to you. You already know you have to make this decision based upon the evidence that you heard, not emotions, not sympathy, facts.

"He also, perhaps, misspoke and said that justice requires conviction. Justice requires justice. And sometimes justice is a conviction and sometimes justice is not a conviction.

"He also, at the very end of his argument, tried to use . . . a quote [from the English statesman Edmund Burke] about evil, what will happen if people don't do things. That's totally inappropriate. And I am asking you to erase that from your minds and stay with the facts, and stay with calm and reason and not emotions in this case. . . .

"That concludes all I have to say about the charges themselves. I made one omission earlier when I was referring to the final arguments of [the prosecutor]. I neglected—also, there was another matter that I found to be improper and I direct you to ignore, and that was [that the prosecutor] was making argument that, with regard to this defendant . . . that there [are] going to be other defendants and so forth and so on. All of that is absolutely

While we do recognize that "[t]he jury, in the absence of a fair indication to the contrary, is presumed to have followed the instructions of the court. *State* v. *Washington*, 182 Conn. 419, 429, 438 A.2d 1144 (1980); *State* v. *Barber*, 173 Conn. 153, 155–57, 376 A.2d 1108 (1977)"; *State* v. *Glenn*, 194 Conn. 483, 497, 481 A.2d 741 (1984); because of the severity and frequency of the offensive misconduct, this is not a case where we can rely on that presumption. See *State* v. *Williams*, supra, 204 Conn. 549. The strength of the court's curative instruction in this case could not overcome the prosecutor's assault.

In the court's curative instruction, it suggested that the prosecutor, in his exuberance, misspoke. To misspeak in the excitement of a closing argument is not an inexcusable or uncommon occurrence; however, our constitution does not permit a state's attorney to proffer a veritable plethora of offending remarks intended to incite an emotional response rather than rational reflection.

The state argues that the facts of this case square with *State* v. *Wilson-Bey*, 21 Conn. App. 162, 171, 572 A.2d 372, cert. denied, 215 Conn. 806, 576 A.2d 537 (1990), where we noted that all but one of the prosecutor's objectionable arguments referred to a charge of which the defendant was acquitted and held that, therefore, the defendant had not been prejudiced by the offensive remarks. The state claims that all of the objectionable statements in this case were aimed at the counts of intentional murder and intentional assault. The state then claims under *Wilson-Bey* that because the defendant was acquitted of these charges, he was not aggrieved and cannot meet his burden of showing prejudice. We disagree.

The state's argument that all of the offensive remarks were aimed at the element of intent and did not affect

impermissible. This case is only about the case that you see in this particular courtroom. Okay."

the overall fairness of the trial misses the mark. First, in this case, we do not agree that all of the remarks can be attributed to the intent element of murder. We point especially to the prosecutor's appeals to the emotions of the jury. See footnotes 12–14. Furthermore, as stated in *State* v. *Williams*, supra, 204 Conn. 543–44, the prosecutor in a criminal trial commands great influence on the jury by reason of his office. It is his influence that can lead the jury to decide the case, not on the evidence presented at trial, but on the jury's reaction to the improper arguments.

In *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), our Supreme Court exercised its supervisory authority to order a new trial because of prosecutorial misconduct. The court's words are also apropos where the misconduct deprives the defendant of a fair trial: "We are mindful of the sage admonition that appellate rebuke without reversal ignores the reality of the adversary system of justice. The deprecatory words we use in our opinions . . . are purely ceremonial. Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice [of verbal criticism without judicial action]—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary." (Internal quotation marks omitted.) Id., 571. We conclude that a new trial is necessary.

## II

Although we will remand this case for a new trial, we will address the defendant's claim challenging the denial of his motion to suppress because that issue will undoubtedly arise in the new trial.

The defendant claims that it was improper for the court to deny his motion to suppress all evidence that

was acquired as a result of an allegedly unlawful, warrantless arrest.[16] The defendant concedes that probable cause for his arrest existed; however, he claims the warrantless arrest inside a private residence and the evidence flowing therefrom constitute an unconstitutional seizure in violation of his federal and state constitutional rights. U.S. Const., amends. IV, XIV; Conn. Const., art. I, § 7.[17] After examining the totality of the circumstances, the court found that there were exigent circumstances permitting the police to act as they did. We agree.

After an evidentiary hearing, the court found the following facts. The Southbury police were summoned to assist the victim at the Southbury Food Center parking lot. The police arrived at approximately 7:45 p.m. and found the dying victim going into shock on the parking lot pavement. Before losing consciousness, the victim revealed that he had been stabbed in Waterbury on Angel Drive by a Jamaican male. Laura Blumberg, a witness to the altercation, was also present at the parking lot.

The police responded to the scene of the crime and seized evidence. The victim was transported to the hospital and taken immediately to the operating room.

[16] The defendant requested that all the evidence seized from the bathroom of the apartment when he was arrested, the testimonial evidence about his flight up the stairs in the apartment and his subsequent statements to the police be suppressed as the fruit of an unlawful, warrantless entry and arrest.

[17] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

Waterbury police officers first arrived at the hospital at about 8:35 p.m. The officers realized that the victim's wounds were life threatening and subsequently spoke to two eyewitnesses to the stabbing. The two witnesses went immediately to the Waterbury police department, and both identified the defendant as the assailant from a photographic array.

After the identification, four officers proceeded to a Waterbury address that the defendant had given when he was arrested earlier that year. At approximately 9:30 p.m., the police arrived at the Dorchester Avenue apartment. Officer Lawrence Smith and Sergeant Steve Flaherty positioned themselves at the front entrance, and Officer Michael Gugliotti and Sergeant Richard Brown went to the back door. Brown peered through a rear window and recognized the defendant from a photograph that he had observed earlier. When Smith and Flaherty knocked on the front door, Brown observed the defendant run upstairs.

The defendant's sister, Lorna Mills, answered the door with a pit bull at her side, prompting the officers to draw their guns. The dog subsequently was restrained. The officers put their weapons back into their holsters and asked who had run upstairs. Mills responded by asking why the officers were there. Smith told her that Brown, who was at the back door, would explain if she let him in. She proceeded to the back door and let Brown into her home. After a short discussion, the officers determined that the defendant had gone upstairs. Mills allowed all the police officers to enter the premises.

Smith and Gugliotti proceeded to the second floor of the apartment to look for the defendant. There they saw a fully clothed woman standing in a running shower. She asked them to leave, but at that time the officers observed the defendant's leg sticking out at the

bottom of the shower. The defendant, wearing only his boxer shorts, was crouched on the floor of the shower enclosure. Jeans belonging to the defendant also were lying on the shower floor. The defendant was taken into custody, transported to Waterbury police headquarters and read his *Miranda*[18] rights. Later that evening, he gave a statement to police.

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Since article first, § 7, of the state constitution is couched in the same language as the fourth amendment, it should be accorded the same interpretation. *Hing Wan Wong* v. *Liquor Control Commission*, 160 Conn. 1, 6 [273 A.2d 709 (1970), cert. denied, 401 U.S. 938, 91 S. Ct. 931, 28 L. Ed. 2d 218 (1971)]; *State* v. *Mariano*, 152 Conn. 85 [94–95, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965)]." *Ajello* v. *Hartford Federal Savings & Loan Assn.*, 32 Conn. Sup. 198, 207, 347 A.2d 113 (1975). Accordingly, "[w]e have in the past . . . expressed the view that article first, § 7 of the Connecticut constitution provides the same protection as the fourth amendment. *State* v. *Grotton*, 180 Conn. 290, 293 [n.3], 429 A.2d 871 (1980); *State* v. *Watson*, 165 Conn. 577, 584, 345 A.2d 532 (1973) [cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974)]." *State* v. *Guertin*, 190 Conn. 440, 453–54, 461 A.2d 963 (1983).

"It is a fundamental principle of constitutional law that searches and seizures inside a house made without

---

[18] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

a warrant are presumptively unreasonable. *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin,* [supra, 190 Conn. 446]. Absent exigent circumstances and probable cause for arrest, a person's house may not be entered without a warrant. *Payton* v. *New York*, supra, 590; *State* v. *Guertin,* supra [446]." *State* v. *Scott*, 27 Conn. App. 403, 406–407, 606 A.2d 720, cert. denied, 222 Conn. 911, 608 A.2d 1184 (1992). "The phrase exigent circumstances refers generally to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. *United States* v. *Campbell*, 581 F.2d 22, 25 (2d Cir. 1978)." (Internal quotation marks omitted.) *State* v. *Guertin,* supra, 447.

Our Supreme Court has accepted the factors[19] enumerated in *Dorman* v. *United States*, 435 F.2d 385 (D.C. Cir. 1970) (en banc), as a sufficient test to justify a warrantless arrest on the basis of exigent circumstances. See *State* v. *Scott*, supra, 27 Conn. App. 410. Having recognized a number of practical problems with the *Dorman* factors, however, but without disapproving of their use, our Supreme Court has adopted the test for exigent circumstances enunciated by the Supreme Court of Appeals of West Virginia in *State* v. *Canby,*

[19] The test enunciated in *Dorman* v. *United States*, 435 F.2d 385 (D.C. Cir. 1970) (en banc), is comprised of the following factors: "These are (1) that a grave offense is involved, particularly one that is a crime of violence; (2) that the suspect is reasonably believed to be armed; (3) that there is a clear showing of probable cause; (4) that there is strong reason to believe the suspect is in the premises being entered; (5) that there is a likelihood that the suspect will escape if not swiftly apprehended; (6) that the entry, though not consented to, is made peaceably, although forcible entry may be justified in some instances. Another factor to be considered is (7) the time of entry. Id., 392–93. The latter factor may cut both ways. A night entry may, on the one hand, underscore the impracticability of securing a warrant and, at the same time, raise particular concern about its reasonableness." *State* v. *Guertin,* supra, 190 Conn. 449–50.

162 W. Va. 666, 669, 252 S.E.2d 164 (1979). *State* v. *Scott*, supra, 409–10. " 'The test of exigent circumstances for the making of an arrest for a felony without a warrant . . . is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a *reasonable,* well-trained police officer would believe, not what the arresting officer actually did believe.' . . . *State* v. *Canby,* [supra, 669]." (Emphasis in original.) *State* v. *Guertin,* supra, 190 Conn. 453.

The court, following *Guertin,* found that exigent circumstances did exist. The defendant was accused of committing an assault, a violent crime. The knife used in the stabbing had not been located. Thus, the defendant might still have been armed with it. On the basis of identifications of the defendant by two eyewitnesses, there was probable cause to arrest the defendant. An officer also observed through an open window that the defendant was present in the apartment and that it was likely that he might escape through the open attics of the building. Finally, a family member allowed the police to enter the premises peaceably. Giving particular consideration to the above factors, the court further stated, on the basis of the totality of the circumstances, that there was a real danger of flight. Furthermore, the court stated that because the stabbing could have left blood on the clothing and body of the perpetrator, the defendant, given enough time, would have been able to destroy evidence. Addressing the final *Guertin* factor regarding the fear that the defendant might endanger the safety or property of others, the court stated: "Not knowing the other occupants of the apartment and knowing that there was probable cause for the arrest

of an assault suspect in their midst, the police had the right, indeed, the duty to intervene. Had they not intervened and had an innocent tenant become harmed by the defendant, the police might even have been civilly liable."

The totality of the circumstances, including evidence that satisfies the *Dorman* factors, would have led a reasonable police officer to reasonably believe that if an immediate arrest of the defendant were not made, he might escape capture, destroy evidence or harm others or their property. We conclude that the court properly found that the evidence satisfied the test adopted in *Guertin*. Because the entry was proper, based on exigency, the trial court properly refused to suppress the evidence that was seized as a result of the arrest.

The judgment is reversed, except as to the trial court's ruling on the motion to suppress, and the case is remanded for a new trial.

In this opinion VERTEFEUILLE, J., concurred.

LANDAU, J., dissenting. Although I agree with the majority that the expressions used by the prosecutor during his closing argument were uncalled for, and this court does not want to encourage their use, I respectfully dissent because I do not think reversal is warranted when the standard concerning prosecutorial misconduct is applied to the facts of this case.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)." (Internal quotation marks omitted.) *State* v. *Cosgrove*, 186 Conn. 476, 488–89, 442 A.2d 1320 (1982). "The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court

that as a result of some occurrence during trial a party has been deprived of the opportunity for a fair trial. *State* v. *DeMatteo*, 186 Conn. 696, 703, 443 A.2d 915 (1982); *State* v. *Gooch*, 186 Conn. 17, 25, 438 A.2d 867 (1982); *State* v. *Turcio*, 178 Conn. 116, 143, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980); see Practice Book § [42-43]. When a mistrial is sought on the ground that a prosecutor's improper remarks violated the defendant's constitutional right to due process of law the same standard applies. See *State* v. *Cosgrove*, [supra, 488–89]; *State* v. *Hawthorne*, 176 Conn. 367, 372, 407 A.2d 1001 (1978). The burden on the defendant is to show that the prosecutor's remarks were prejudicial in light of the entire proceeding. See *State* v. *Cosgrove*, supra, 488–89; *State* v. *Hawthorne*, supra, 372; *State* v. *Kinsey*, 173 Conn. 344, 348–49, 377 A.2d 1095 (1977). The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. *State* v. *Cosgrove*, supra, 488–89, citing *Smith* v. *Phillips*, [supra, 219]." *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

The following additional procedural facts are necessary to put this case in proper context. The defendant was charged, by way of a long form, substitute information, with murder in violation of General Statutes § 53a-54a, manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and (3),[1] and assault in the first degree in violation of General Statutes § 53a-

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

59 (a) (1) and (3).[2] Defense counsel argued to the jury that it could not find the defendant guilty of murder beyond a reasonable doubt. The jury acquitted the defendant of murder, manslaughter in the first degree in violation of § 53a-55 (a) (1) and assault in the first degree in violation of § 53a-59 (a) (1). The jury found the defendant guilty of manslaughter in the first degree in violation of § 53a-55 (a) (3) and assault in the first degree in violation of § 53a-59 (a) (3).

The majority relies on *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987), for the law concerning prosecutorial misconduct. *Williams* is a case in which our Supreme Court reversed the judgment of the trial court due to a pattern of prosecutorial misconduct. The facts of *Williams* are substantially different from the facts of this case. In *Williams*, the defendant was charged with assault in the first degree and risk of injury to a child. Id., 524. All of the evidence was circumstantial, and the credibility of the state's witnesses was greatly in dispute; one of them was a child. Id., 550. Defense counsel did not preserve the error, and our Supreme Court heard the case pursuant to the second exceptional circumstance of *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973). *State* v. *Williams*, supra, 536.

The *Williams* court stated: "The record in this case discloses a pattern of misconduct, repeated and strident, by the assistant state's attorney during both the cross-examination of the defendant and of his key defense witness, and during closing argument. This misconduct falls within at least four categories of pro-

---

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

scribed behavior: (1) expressions of opinion by the prosecutor as to witness credibility and the ultimate issue of the defendant's guilt; (2) suggestions that the jury draw inferences from facts not in evidence; (3) appeals to the passions and emotions of the jurors; and (4) injection of extraneous matters." Id., 540–41.

The case before us now does not reveal a pattern of prosecutorial misconduct. The defendant's claims relate to final argument only. Defense counsel objected to the prosecutor's conduct and moved for a judgment of acquittal and a new trial based in part on the prosecutor's misconduct. The claims were properly preserved for appellate review. Furthermore, in response to defense counsel's objections, the court gave curative instructions at the time objections were made and during final argument. In her closing argument, defense counsel addressed the prosecutor's comments, reminding the jury that the trial was about the defendant, not the victim, and that the defendant was innocent until proven guilty. Defense counsel's closing argument acknowledges that there was an altercation between the defendant and the victim.

Perhaps the most important distinction between the facts here and in *Williams* is that the fight between the defendant and the victim was witnessed. None of the witnesses in this case saw a knife, but their testimony was not seriously called into question. There was expert testimony that the victim died as the result of stab wounds. The police captured the defendant fully clothed standing under a shower. The jury convicted the defendant of the lesser manslaughter and assault counts, not murder and the intentional manslaughter and assault counts. The conviction demonstrates that the jury listened to the evidence and to defense counsel. These facts do not demonstrate, in my opinion, that the defendant was not afforded a fair trial and that his constitutional due process rights were violated.

I concur with the majority that prosecutors hold an important position in our judicial system and that they have an obligation to abide unfailingly to our rules of law and practice. Although the prosecutor here may have lost sight of this paradigm in the heat of final argument, I do not believe the facts of this case present us with an appropriate occasion to reverse the judgment of conviction. For these reasons, I respectfully dissent.