Filed 12/10/13  P. v. Williams CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN WILLIAMS,<br><br>    Defendant and Appellant. | A136081<br><br>(San Mateo County<br>Super. Ct. No. 414805) |

Christian Williams was committed to the Department of Mental Health (DMH) (now Department of State Hospitals) for an indefinite term after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.; SVPA).  On appeal, he contends that his commitment cannot be sustained because the jury's determination resulted from prosecutorial misconduct, and the SVPA is unconstitutional. We disagree and affirm.

## I.  BACKGROUND

On September 26, 2006, the San Mateo County District Attorney filed an amended petition to recommit Williams to the custody of the DMH for an indeterminate term as an SVP.  Following a jury trial, the jury found Williams to be an SVP on June 10, 2011. The court committed him to the DMH for an indeterminate term on May 31, 2012.  This timely appeal followed.

At trial, the People bore the burden of proving beyond a reasonable doubt that (1) Williams had been convicted of at least two separate sexually violent offenses, (2) he has a "diagnosed mental disorder," and (3) his mental disorder makes it likely he will

engage in sexually violent behavior if released.  (Welf. & Inst. Code, § 6600; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138.)

**A.  *Prosecution Case***

Between 1984 and 1985, Williams sexually assaulted and/or sodomized five boys, 11 to 13 years old.   He was convicted of 13 qualifying offenses.

Drs. Harry Goldberg and Robert Owen, both licensed clinical psychologists and members of the DMH SVP evaluator's panel, evaluated Williams as an SVP.  Both doctors diagnosed Williams with pedophilia, which impaired his emotional and volitional capacity and predisposed him to criminal sexual acts.

Both doctors testified Williams was likely to engage in sexually violent criminal acts as a result of his diagnosed mental disorders.  Drs. Goldberg and Owen evaluated Williams's risk of reoffense using an actuarial risk formula: the Static-99R.  Williams received a score of 4 on the Static-99R, which placed him in the moderate-high risk category to reoffend and correlated with a rate of reoffense of 20.1 percent over five years and 29.6 percent over 10 years.  The doctors considered Williams's age—59—as a mitigating factor, but because the Static-99R accounts for Williams's advancing age, they did not believe his risk was sufficiently reduced to make him safe for release.  The doctors also noted Williams's preferred method of victimizing young boys did not require physical prowess, and his advancing age was not accompanied by health problems limiting his ability to reoffend.  The experts found no other protective factors, such as offense-free time in the community or the completion of treatment, which would decrease his risk beyond the moderate-high category.

**B.  *Defense Case***

Drs. Dawn Starr and Jeremy Coles were also appointed by the DMH to evaluate Williams as a sexually violent predator.  Both doctors concluded Williams was not likely to reoffend if released from custody.  Dr. Starr evaluated Williams in 2004, 2006, and 2007, and concluded Williams met the SVP criteria.  In 2009, she changed her opinion and found him not likely to reoffend if released.  According to Dr. Starr, she changed her opinion based on Williams's advancing age, Williams's increased empathy and self-

reflection regarding his sexual offenses, and Williams's well-developed release plan. Dr. Starr gave Williams a score of 3 on the Static-99R, which correlated to a 12 percent risk of reoffense over five years, and an 18 percent risk of reoffense over 10 years.

Dr. Coles concluded that although Williams posed a risk of reoffense, it was not a substantial, serious, and well-founded risk. With a Static-99R score of 4 that Coles gave him, Williams would be in the moderate-high risk group with a risk of reoffending within 10 years of 29.6 percent. However, he based his opinion primarily on the fact Williams would turn 60 within six months, dropping his Static-99R score to a 1, which correlated with a risk of reoffense of 9 to 15 percent over 10 years. Dr. Coles also relied on the fact Williams had committed sex crimes for a relatively short six-month period in 1984–1985 and had been held in confinement ever since. He noted people incarcerated only once had low reoffense rates whereas offenders with a history of recommitting sexual offenses after being convicted, punished, and released one or more times are placed at a higher risk of reoffending in an SVP evaluation. Dr. Coles also considered that Williams did not suffer from antisocial personality disorder which would increase his risk, he had a stable social network if released, and he now recognized and severely regrets the harm he caused to his victims.

Paul Metz, the husband of Williams's cousin, testified he would provide Williams a job in his company if Williams was released. Eric Ribeiro, a friend since the 1980's, testified he never saw Williams express any interest in children. Richard Shive, another friend of Williams, testified he would offer Williams a place to live in Southern California if he were released.

Two employees at Coalinga State Hospital testified they had never seen Williams with any sexual materials even though such materials were permitted and it was common to have them. Two psychologists indicated they would be willing to provide outpatient treatment to Williams if he were released.

## II. DISCUSSION

Williams contends the judgment must be reversed because (1) the prosecutor committed prejudicial misconduct by making improper appeals to passion and prejudice

3

in her rebuttal argument to the jury, and (2) the SVPA violates equal protection by treating persons subject to SVP commitment more harshly than persons subject to the state's other involuntary commitment statutes.

## A. *Prosecutorial Misconduct*

### 1. *Relevant Factual Background*

Near the end of his closing argument to the jury, Williams's trial counsel made the following statements:

"This is a very difficult case because without any question it evokes the strongest emotion. Mr. Metz, the guy who is going to do the most for Mr. Williams said his conduct is repulsive. People freely and rightly say that what happened was despicable. But what we started out in this case doing was talking about whether or not you can listen to the facts and with that background knowing all that and in this atmosphere still make a fair decision for, in applying the law and hold the government to its burden of proving this beyond a reasonable doubt. And that includes making the decision whether or not it is truly likely that Mr. Williams is going to reoffend and not really a decision that because, that you're not going to run any risk that he would do it. If you can't decide on the basis no risk of this is acceptable to me, I won't run any such risk, that any possibility of it is too much for me and I will vote for this petition to be true if I think there is any risk of that.

"That's not the oath you took. You took the oath to follow the law. *The law requires the government produce evidence that proves to you in an abiding way that it is likely it's going to happen, not that there is just a possibility, or some chance, or it could be, but that it is likely. And that word can't be twisted. It's a short, old, ancient, clear, obvious word. Is it likely to rain tomorrow*[*?*] *Are you likely to be on time to where you're trying to get to*[*?*] *It's a word we use every day. We know exactly what it means*. Is it likely that Mr. Williams is going to reoffend[?] Has it been proven beyond a reasonable doubt that it's likely he'll reoffend[?] The statistical things say that it's a low likelihood." (Italics added.)

The prosecutor's rebuttal argument included the following response to the defense arguments:

"So let me just repeat. And I said this in my opening statement and I'm going to say it again now. It's up to you to decide, this is your decision, whether the risk is substantial and well founded and serious. And when you look at those numbers, those Static numbers that come out with 1 [in] 3 or 1 [in] 4 chance of reoffense remember we're not talking about what the chances are that it's going to rain tomorrow. We're aren't talking about what the chances are that someone is going to go out and smoke marijuana or shoplift or even rob a bank. *We're talking about someone who's going to destroy a kid's life.* And that's why I say 1 in 3 or 1 in 4 is an unacceptable risk.

"And that's how you have to look at this case. You can't just look at it lightly in the sense that [defense counsel] wants you to look at it, likelihood of rain or likelihood that you'll make it to court on time. You have to look at the risk when you—when you look at likelihood of risk you have to also look at what is the harm. Would you get on a plane that had a 25 or 30 percent chance of crashing[?] That's serious, well founded and substantial. If it was just up to the experts, if it was just up to Goldberg and Owen and Starr and Cole we wouldn't need you.

"So obviously this last factor, likelihood of reoffense can't be—and I agree with [defense counsel]—it can't be zero. We can never guarantee someone won't reoffend. But is he really saying a 1 and 3 or a 1 and 4 chance of reoffense isn't well founded and substantial.

"Let me just close by saying this. Anytime you talk about a loss of liberty it's a serious matter. We expect, both sides expect that you are going to take your job when you go into the deliberation room seriously. We're talking about keeping a man in a secured facility, not allowing him to be free.

"And I'm standing here before you asking you to deny this man, this man of that liberty *because community safety demands it* and the law requires it. The right of the public to be free from the danger of sexual predators like Mr. Williams outweighs the right of the individual who poses—

"[Defense counsel]: I object, if I can, on the grounds that this is improper argument of public feeling, compassion, prejudice. It's contrary to the legal standards the jury has to apply in this case which is whether it is likely he's going to reoffend.

"[The court]: Close. Let's move on to that."[1] (Italics added.)

After the conclusion of the rebuttal argument, the parties had a sidebar conference. The discussion was recounted for the record after the jury began its deliberations. Defense counsel said he had objected at the conference because "[t]he district attorney's argument converted or presented the question in the case for the jury as being . . . essentially whether or not they were willing to risk—run any risk at all with children and that this case was about protecting children and what is the risk they're willing to take on behalf of children and ruining lives and that they [the jurors] are the final deciders of what the level of risk is that's required by the law." He explained he objected when he felt the prosecutor's argument "went back to this issue about the pure protection of children and you [the jury] are the ones that decide what . . . level of probability . . . you're willing to take. And that's when I objected. . . . on grounds that that was about public compassion, prejudice and feeling." He added: "The old term was don't decide a case on public feeling.[2] [¶] That's almost a definition of deciding a case on public feeling. Won't you protect the children. . . . I mean that's the signature appeal to [emotion] of the whole world. . . . I mean that's not the law. And it's also not the law that [the jurors] get to decide what the standard of probability is. [¶] The instruction says it. The instruction says likely."

Defense counsel asked for a curative instruction that the jury is "not the judge[] of what the level of probability is; the level of probability that the law requires is stated in the instructions." The court found no curative instruction was required or justified. The court explained counsel's objection to the prosecutor's community safety reference had

---

[1] At that point the prosecutor moved to a different topic and concluded her rebuttal argument.

[2] CALJIC No. 1.00 states in part: "You must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."

interrupted the prosecutor's comment before she finished it, the trial court "basically sustained" the objection, and the prosecutor had stopped at that point and finished her rebuttal with other arguments. In the circumstances, the court stated it did not need to decide whether it was an improper emotional appeal: "It was one comment. It was objected to. And I don't think it required—it's not legally incorrect I don't think."

### 2. *Analysis*

Williams summarizes his prosecutorial misconduct arguments as follows: "By arguing appellant was someone who was going to 'destroy a kid's life' the prosecutor appealed directly to the universal revulsion of the public to child molesters . . . . [¶] The prosecutor's argument to the jury that when one looked at the likelihood of [reoffense] one also had to look at the harm was but another way of reminding the jury . . . they were looking at someone who was going to destroy a kid's life. . . . [¶] The prosecutor's [statement] that . . . community safety demanded they take away appellant's liberty and the law required it was the grand finale of her argument to the passion and prejudice of the jury. Of course, neither [of] those . . . factors demanded what she claimed."

Preliminarily, Williams addresses whether defense counsel preserved his objection to the prosecutor's "destroy a kid's life" statement for appellate review. The record shows counsel made no objection until the prosecutor asserted, more than a dozen sentences later, that "community safety" demanded the denial of Williams's liberty. Counsel explained he regarded the latter comment as a renewal of the issue of protecting children. As Williams points out, an objection need not be made at the very outset of assertedly improper comments in order to be preserved. (See *People v. Vance* (2010) 188 Cal.App.4th 1182, 1198 (*Vance*).) Common sense requires that counsel, before having to interpose an objection, have time to appreciate the thrust of a prosecutor's argument and to weigh whether the argument is being pressed sufficiently hard that that an objection makes tactical sense and would not serve only to emphasize the argument for the jury. (*Ibid.*)

In *Vance,* the prosecutor began to narrate the last minutes of the victim's life in graphic detail from the perspective of the victim during her closing argument. (*Vance,*

7

*supra,* 188 Cal.App.4th at pp. 1193–1194.)  Defense counsel did not object for a minute or more, at which point the court sustained the objection, but the prosecutor continued in the same vein through repeated objections, culminating in an unsuccessful motion for a mistrial.  (*Id.* at pp. 1194–1197.)  The Court of Appeal recognized that the prosecutor's attempt to get jurors to identify with the suffering of the victim and his family constituted a universally condemned form of  improper argument—a "Golden Rule" argument—and it declined to hold the defense had waived it by not rising immediately to object.  (*Id.* at pp. 1198–1199.)  We find *Vance* distinguishable.

Here, the prosecutor made two distinct arguments to which Williams objects. First, the prosecutor suggested the jury must evaluate the likelihood or risk of Williams reoffending in conjunction with the extent of the harm that would occur if he did— described as "destroy[ing] a kid's life."  Second, the prosecutor argued that community safety demanded a finding Williams was an SVP.  While the two arguments are not logically unrelated, they are distinct arguments subject to objection on different grounds. We begin with the second argument since there is no dispute Williams preserved his objection to it.

On one level, the prosecutor's appeal to community safety seems more like an innocuous bit of rhetorical flourish—a final exhortation to decide the case in favor of the prosecution—than an appeal to passion or prejudice.  It is like declaiming at the conclusion of a closing argument in a criminal prosecution that justice requires a guilty verdict.  Courts are split on whether such arguments are improper.  (See, e.g., *State v. Mills* (2000) 57 Conn.App. 202, 207–209 [improper expression of prosecutor's personal opinion]; *People v. Crawford* (1991) 187 Mich.App. 344, 353–355 [improper appeal to jurors' civic duty]; *Swan v. State* (Del. 2003) 820 A.2d 342, 356, overruled on other grounds in *Baker v. State* (Del. 2006) 906 A.2d 139, 150 & fn. 20 [not improper; merely asking the jury to decide the case based on the evidence]; *U.S. v. Pirro* (2d Cir. 2001) 9 Fed. Appx. 45, 51 [proper argument merely summing up prosecution's contention that it had proven its case for conviction].)  In this case, the reference to community safety could be construed as simply a summation of what the prosecution contended was shown

8

by the evidence. Determining whether a person poses a danger to community health and safety is, after all, precisely what is at issue in an SVP case. (Welf. & Inst. Code, §§ 6600, subds. (a)(1) & (c), 6608, subd. (d); CALCRIM No. 3454.) On the other hand, the reference could be construed as an improper appeal to civic duty. We need not decide the issue. In our view, the assertion that community safety demanded an SVP finding could not be considered prejudicial in itself. As the trial court pointed out, defense counsel's objection to it was in substance sustained, and the prosecutor went on to close without attempting to make that claim again. In fact, it was apparent from the arguments of counsel put on the record—almost all relating to the "destroy a kid's life" comment— that defense counsel's objection to the community safety comment was in reality a belated objection to the prosecution's earlier line of argument concerning how the jury should approach evaluating Williams's likelihood of reoffending. Although Williams asks us to conflate the two arguments, we are unpersuaded. We turn to the prosecutor's earlier comments now.

Some aspects of the prosecutor's rebuttal comments about the nature of the risk involved in releasing Williams from confinement had already been argued to the jury *without* objection in the prosecution's opening argument. When she opened, the prosecutor emphasized that the critical issue for the jury to decide was how likely Williams would be to engage in sexually violent and predatory behavior if released. She said the word "likely" was the key word in the case, which she explained meant a "substantial[,] serious and well-founded" risk. She reminded the jurors, without objection, that she had told them in her opening statement this was something "you as the jurors in this case get to decide," and that there was no "magic number." Then she argued as follows, without objection: "When we talk about a serious risk I think the question you need to ask yourself is risk of what. What is it that we're concerned about. We're talking about child molest. Is there a more serious crime[?] Is there a more vulnerable victim[?] [O]bviously the risk that we're talking about here in this case is serious." Thus, in our view, defense counsel did not timely object to the prosecution's arguments that (1) it was for the jury to decide what level of probability made it likely

9

that Williams would commit another sexual offense, and (2) in making that determination the jury could consider the degree of harm Williams would cause if he molested another child. In any event neither of these arguments was improper. Both are correct statements of the law.

At most therefore, Williams preserved objection to the prosecutor's assertion, "We're talking about someone who's going to destroy a kid's life." In our view, the argument was not improper when viewed in its full context. Defense counsel had urged the jury to apply the word "likely" as if it carried the same meaning it has in everyday usage, such as whether it was likely it was going to rain tomorrow. That suggested the jury could not find Williams to be an SVP unless it found it more likely than not he would reoffend. But under controlling precedent, the risk of reoffense warranting continued confinement can be less than 50 percent as long as it is greater than a "mere possibility," and amounts to a "substantial danger, that is, a serious and well-founded risk" the defendant will commit sexual crimes if released from custody. (*People v. Roberge* (2003) 29 Cal.4th 979, 985–988, italics omitted.) As the context of her comments makes clear, the prosecutor was trying to explain why jurors should view a one-in-three or one-in-four risk as unacceptable in the case of child molestation, and should consider the situation as more akin to deciding whether to get on a plane with a 25 or 30 percent chance of crashing than deciding whether it was likely to rain tomorrow. That is a fair rejoinder to the defense's argument, and is consistent with the SVPA as construed by the courts.

It is true the prosecutor's phrasing suggested Williams was someone who would destroy a child's life if released. Viewed in isolation, that stepped over the boundary of appropriate argument by appealing to emotion and going outside the evidence before the jury. But even assuming the prosecutor's phrasing was improper and the objection was not forfeited by counsel's delay in raising it, reversal is not required. The assertion was isolated and brief in light of the entirety of the prosecutor's opening and rebuttal arguments, in which she focused on the relevant evidence, repeatedly reminded jurors the word "likely" in the jury instructions meant a serious, substantial, and well-founded risk

of reoffending, and engaged in no pattern or practice of appealing to juror revulsion about child molestation.  In any event, the trial court properly inoculated jurors against lending undue credence to the remarks of counsel.  The jury was instructed nothing the attorneys said was evidence.  It was instructed not to let bias, sympathy, prejudice or public opinion influence its decision.  The jurors were told to follow the instructions in case of any conflict between the instructions and the attorneys' comments on the law.  Jurors were instructed to pay careful attention to the definitions in the instructions.  Just before closing arguments began, the court reminded jurors that closing arguments were not evidence, and although counsel could paraphrase the rules, "I just read you the exact rules so you have that in mind."  Jurors had these written instructions with them in the jury room when they deliberated.  We do not find it reasonably probable that a result more favorable to Williams would have occurred but for the prosecutor's reference to him as "someone who's going to destroy a kid's life."

**B.** *Equal Protection*

In *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), the California Supreme Court considered a claim that civilly committing an SVP for an indeterminate term and placing the burden on the committed person to obtain release violates the person's state and federal constitutional right to equal protection.  (*Id*. at p. 1184.)  The court found "the state ha[d] not yet carried its burden of demonstrating why SVP's, but not any other ex-felons subject to civil commitment, such as mentally disordered offenders, are subject to indefinite commitment."  (*Ibid*.)  It remanded the matter to the trial court to permit the People the opportunity to justify the differential treatment in accord with established equal protection principles.  (*Ibid*.)  On remand, after an extensive evidentiary hearing, the trial court found the People met their burden under *McKee I* to justify the disparate treatment of SVP's.  (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1330, review den. Oct. 10, 2012, S204503 (*McKee II*).)  *McKee II* affirmed the trial court's determination, and the Supreme Court denied review.  (*Id*. at p. 1350.)  Williams contends *McKee II* was wrongly decided, and the indeterminate commitment imposed in this case should be

11

reversed and the matter remanded to the trial court for further proceedings in accordance with *McKee I*.

We note first that when the Supreme Court decided *McKee I*, it had a series of cases involving equal protection challenges to the SVPA on "grant and hold" status. It transferred these cases back to the Courts of Appeal with directions to vacate their prior opinions and reconsider the issue in light of *McKee I*. The transfer orders provided in relevant part: "In order to avoid an unnecessary multiplicity of proceedings, the court is additionally directed to suspend further proceedings pending finality of the proceedings in *McKee* [*I*] . . . . 'Finality of the proceedings' shall include the finality of any subsequent appeal and any proceedings in this court." (See for example the Supreme Court transfer orders in *People v. Johnson*, review granted Aug. 13, 2008, S164388; *People v. Riffey*, review granted Aug. 20, 2008, S164711; *People v. Boyle*, review granted Oct. 1, 2008, S166167; and *People v. Rotroff*, review granted Jan. 13, 2010, S178455.)[3]

While we are not bound by the Supreme Court's transfer orders in these cases or its denial of review in *McKee II*, we also cannot disregard its clear message to the state's trial and appellate courts that *McKee II*'s factual and legal conclusions on the equal protection claim should be treated as binding unless and until a higher court directs otherwise, and duplicative proceedings addressing those issues were to be avoided. Williams invites us to discount the Supreme Court's guidance, which we decline to do. In any event, we reject Williams's position *McKee II* misapplied the strict scrutiny test and utilized an overly deferential standard for reviewing the evidence presented in the trial court. We find *McKee II* properly adhered to the form of review required by the Supreme Court in *McKee I*. (See *McKee I*, *supra*, 47 Cal.4th at pp. 1206, 1210–1211.)

---

[3] The same order was later issued in *People v. Glenn*, review granted February 10, 2010, S178140; *People v. Barbour*, review granted July 28, 2010, S183450; *People v. McKnight*, review granted July 28, 2010, S183315; *People v. Judge*, review granted July 28, 2010, S182384; *People v. Dannenberg*, review granted August 18, 2010, S184382; *People v. Schuler*, review granted September 1, 2010, S183062; and *People v. Gomberg*, review granted October 20, 2010, S185107.

Having reviewed the evidentiary showing set out in *McKee II*, we find it justifies the disparate treatment upon which Williams bases his equal protection claim.[4] It is unnecessary for us to remand this case for an evidentiary hearing to plow the same ground again. (See *People v. McKnight* (2012) 212 Cal.App.4th 860, 862, review den. Mar. 13, 2013 [agreeing with *McKee II*'s equal protection holding and finding it applied to all SVP's]; *People v. Landau* (2013) 214 Cal.App.4th 1, 48, review den. May 22, 2013, S209450 [agreeing with *McKee II*'s reasoning and conclusion and noting that respondent made no showing he was able to introduce "any new or different evidence that would require a different result"]; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1079, review den. May 22, 2013, S208845 [same]; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1371, review den. July 10, 2013, S210418 [agreeing with *McKnight*].)

## III. DISPOSITION

The judgment is affirmed.

---

[4] The evidence supported the conclusion that (1) released SVP's as a class have higher reoffense rates than other sex offenders and persons subject to civil commitment under other statutes; (2) the emotional and psychological harm suffered by victims of sex offenses is greater than that caused by other types of offenses; (3) SVP's pose an increased risk of harm to children; (4) SVP's have significantly different diagnoses from those of persons subject to civil commitment under other statutes, and differences in treatment plans, rates of compliance and success rates are significantly different for SVP's compared to these persons. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1342–1344, 1347.)

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Sepulveda, J.[*]

_____

[*] Retired Associate Justice of the Court of Appeal, First Appellate District assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.