******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TAMARIUS MANER
(AC 35109)

DiPentima, C. J., and Keller and Mihalakos, Js.

*Argued September 23, 2013—officially released January 28, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, Prescott, J.)

*Auden Grogins*, assigned counsel, for the appellant
(defendant).

*Robert J. Scheinblum*, senior assistant state's attor-
ney, with whom, on the brief, were *Maureen Platt*,
state's attorney, and *John J. Davenport*, supervisory
assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Tamarius Maner, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, home invasion in violation of General Statutes § 53a-100aa (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (3), and attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (5). On appeal, the defendant claims that (1) the trial court improperly admitted into evidence a firearm and testimony related to that firearm, (2) the court improperly admitted into evidence the testimony and written statement of a witness, and (3) he was deprived of the right to a fair trial as a result of prosecutorial impropriety. We are not persuaded by the defendant's claims on appeal and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 26, 2008, Maria Guadalupe Orzuna-Sanchez, who was dating the defendant, encountered Joseph Samaba on a street corner in Waterbury. Orzuna-Sanchez, Samaba, the defendant, and another individual went to the apartment of the victim, James Caffrey. Orzuna-Sanchez and Samaba smoked marijuana while the defendant spoke with the victim about purchasing marijuana from him. The victim retrieved some marijuana from his bedroom and sold the defendant seven grams. Later in the evening, the defendant announced that he had to leave in order to take a train to return home to Bridgeport.

The victim lived with his girlfriend, Samantha Bright, and a roommate, Ray Ramos, in a second floor apartment. The victim's mother lived in the first floor apartment beneath the victim. At some point, the victim and Bright went to sleep. Bright heard the doorbell ring about 1:15 in the morning, and the victim went to the door, turning on lights in the living room, kitchen and hallway. Bright heard a brief conversation, followed by a single gunshot. Before she could get out of the bed, the defendant, wearing a khaki sweatshirt, and Calvin Bennett,[1] wearing a gray sweatshirt, appeared in the doorway, and both were holding small black guns. Bennett approached Bright, placed his gun to the back of her head and asked where the money and marijuana was. She indicated that it was in the top dresser drawer. As the defendant opened the drawer, the victim's mother, Emilia Caffrey, who had come upstairs and into the second floor apartment, began screaming. Caffrey saw her son face down on the floor and "full of blood." The defendant and Bennett exited the bedroom and the defendant shot at Caffrey, who fell to the floor.

Francis Brevetti, a Waterbury police officer, received a call from the police dispatch of possible gunshots

fired at the victim's apartment. After he arrived at the scene, Brevetti turned the victim over and observed a bullet wound in the victim's head and a spent .45 caliber casing. Brevetti provided medical aid to the victim until paramedics arrived. The victim later died, and it was determined that the cause of death was a gunshot wound to the head.[2]

After an investigation, the police arrested the defendant. Following a trial, the jury found the defendant guilty of felony murder, home invasion, burglary in the first degree and attempt to commit assault in the first degree. The jury failed to reach a verdict with respect to a charge of murder, which the court subsequently dismissed. The court sentenced the defendant to seventy years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly admitted into evidence a firearm and testimony related to that firearm. Specifically, he argues that the court abused its discretion in admitting that evidence and that such error was harmful. We conclude that the court improperly admitted the firearm into evidence, but that the defendant has failed to sustain his burden of establishing harmful error.

The following additional facts and procedural history are relevant to our discussion. On December 29, 2009, the defendant filed a motion in limine to preclude the state from entering the firearm into evidence, arguing that any probative value was "far outweighed" by its prejudicial effect.[3] On January 4, 2011, just prior to the start of the trial, the court heard argument on the defendant's motion. The court confirmed with defense counsel that this firearm had been seized pursuant to a search warrant from Bennett's apartment and contained Bennett's DNA on it. The court understood that the state's purpose of using the firearm as evidence was to corroborate eyewitness testimony that both individuals who entered the victim's apartment at the time of the shooting were armed and that this firearm, seized from Bennett's apartment, was not the same weapon used to kill the victim and shoot at Caffrey. Defense counsel acknowledged the probative value of the firearm, conceded that it was relevant, but argued that this particular firearm could not be connected to the defendant. He stated the issue as follows: "How closely or how definite can we say that the gun . . . was the actual gun that was in the apartment? It was not seized off [Bennett's] person. It was seized in [Bennett's] apartment in a suitcase with shells that other people have access to."[4] Counsel also claimed that the admission of the actual firearm under these circumstances was unduly prejudicial. The court denied the motion in limine.

During her testimony at the defendant's trial, Bright described the weapons held by the defendant and Bennett as "handguns, little black guns." She also admitted that she was not familiar with guns in any way and that she did not know the difference between a pistol and a revolver. At this point, the prosecutor showed her the firearm that had been seized from Bennett's apartment, and Bright said that she had seen a "gun like that" when the victim had been killed. She could not, however, describe the weapon shown to her in any other way except as a small black handgun.

During cross-examination, Bright stated that she "[didn't] know anything about guns" and that if shown photographs of eight different guns, she would only be able to identify the one used by the defendant if it was one that could be held in your hand, little and black. Finally, during redirect examination, Bright noted that if she were shown photographs of eight similar guns, she would not be able to tell one from the other if they looked alike, but that Bennett had held a gun to her head and that the one used by the defendant was similar to the one that she had been shown in court.

Joseph Rainone, a Waterbury police officer and firearm toolmark examiner, testified that he examined the firearm seized from Bennett's apartment.[5] He determined that the two casings found in the victim's apartment were fired from the same gun. He also concluded that those casings did not come from the firearm seized from Bennett's apartment. Christine Roy, a forensic science examiner, testified that Bennett's DNA could not be eliminated as a contributor to the DNA recovered from the handle area, muzzle area and slide area of the firearm seized from his apartment. Roy also noted that the defendant was eliminated as a contributor to the DNA samples recovered from this firearm.

On appeal, the defendant argues that the evidence relating to this firearm had a minimal nexus to him and to the offenses charged, and was not relevant because the firearm was immaterial to the proceedings. He further contends that this error was harmful. The state counters that a sufficient nexus existed, the firearm was relevant, and that even if the firearm was admitted into evidence improperly, such error was harmless.

A

Our first task is to determine whether the court abused its discretion in admitting the firearm found in Bennett's apartment into evidence. We begin our analysis by setting forth our standard of review. "Our analysis of the [defendant's] . . . [claim] is based on well established principles of law. The trial court's ruling on the admissibility of evidence is entitled to great deference . . . [and] will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Despite this deferential standard, the trial court's dis-

cretion is not absolute. . . . Thus, [i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citation omitted; internal quotation marks omitted.) *State* v. *Zillo*, 124 Conn. App. 690, 695, 5 A.3d 996 (2010); see also *State* v. *Jacobson*, 283 Conn. 618, 626–27, 930 A.2d 628 (2007); *State* v. *Lewis*, 146 Conn. App. 589, 601, 79 A.3d 102 (2013).

We set forth the applicable legal principles regarding relevancy and materiality. "Section 4-1 of the Connecticut Code of Evidence provides: Relevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. As it is used in our code, relevance encompasses two distinct concepts, namely, probative value and materiality. . . . Conceptually, relevance addresses whether the evidence makes the existence of a fact material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . In contrast, materiality turns upon what is at *issue* in the case, which generally will be determined by the pleadings and the applicable substantive law. . . . If evidence is relevant and material, then it may be admissible." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Zillo*, supra, 124 Conn. App. 696–97; see also *State* v. *Izzo*, 82 Conn. App. 285, 291–92, 843 A.2d 661, cert. denied, 270 Conn. 902, 853 A.2d 521 (2004); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) §§ 4.1.2 and 4.1.3, pp. 135–36.

Here, the determinative question is whether the firearm, found in Bennett's apartment without the DNA of the defendant on it and determined not to be the firearm discharged in the victim's apartment, was material in the defendant's trial. A review of the pertinent case law facilitates our discussion. In *State* v. *Mozell*, 36 Conn. App. 672, 673, 652 A.2d 1060 (1995), New Haven police officers suspected the defendant and others of being part of a drug ring, and conducted surveillance as part of the investigation. They obtained search warrants for the residences of Millicent Parker and Nicole Lowery. Id., 673–74. At Parker's home, police found various items used in the packaging of drugs and a large quantity of cocaine. Id., 674. At Lowery's apartment, a .38 caliber handgun was found. Id. The defendant was charged with conspiracy to sell narcotics and possession of narcotics with intent to sell. Id., 673. At his trial, a charged coconspirator testified that Ernest Williams, the suspected leader of the drug ring, had been carrying the gun. Id.,

674. Lowery testified that Williams had brought the gun to her apartment and that the defendant had accompanied him. Id. On appeal, the defendant argued that "because there was no evidence tying the seized gun to the alleged conspiracy, the gun and Lowery's testimony concerning the gun were improperly admitted into evidence." Id., 675. We noted that "the defendant was never alleged or shown to be in possession of the gun. Nor was the gun alleged or shown to be involved in any of the activities observed by the surveillance team. . . . There was no connection between the gun and the offense charged in this case; nor was there any connection between the gun and the defendant. It is error to allow into evidence [articles or] testimony concerning articles seized . . . that tend to indicate criminal propensity when those articles are not connected to the commission of the crime charged." (Internal quotation marks omitted.) Id., 677. Under those facts and circumstances, we concluded that the trial court had abused its discretion in admitting into evidence the gun and the testimony regarding the gun. Id.

In *State* v. *Coleman*, 35 Conn. App. 279, 281, 646 A.2d 213, cert. denied, 231 Conn. 928, 648 A.2d 879 (1994), the victim was sleeping in her bed when an assailant entered her room and placed a knife at her throat. A struggle ensued and the victim suffered several lacerations and blows to her face. Id. The victim escaped and the police were called. Id. The police seized three knives from the defendant's car approximately two weeks after the attack; id., 282; and he was convicted of burglary in the first degree, assault in the first degree and attempt to commit robbery in the first degree. Id., 280. On appeal, the defendant argued that the state had failed to "establish a nexus between [the knives seized from his car] and the crimes with which [he] was charged." Id., 284. We stated: "There is nothing in the record to suggest that the knives found in the defendant's car had any connection to the crimes committed against the victim. Although the victim testified that she was awakened in her apartment by an assailant who was holding a knife against her throat and that during a struggle with him her right hand was slashed by the blade of the knife, the state never connected the fact of the defendant's possession of three knives with the commission of the crimes for which he stood charged. The knives were discovered in the defendant's car more than two weeks after the victim was assaulted, the victim never described the knives used by her assailant, and the state never argued that one of the defendant's knives was used in the assault against the victim." Id., 285–86.

The state, citing several cases, argued that the fact that none of the knives was identified positively as the one used in the crime went to the weight of the evidence and not to its admissibility. In rejecting this argument, we noted that in each of the cases cited by the state,

there was some evidence linking the item to the crime charged.[6] Id., 286. We then stated: "It is error to allow into evidence testimony concerning articles seized from the defendant that tend to indicate criminal propensity when those articles are not connected to the commission of the crime charged." Id., 287. Because the state failed to produce evidence connecting the knives found in the defendant's car with the assault of the victim, we concluded that the court abused its discretion in admitting into evidence the testimony regarding the seized knives. Id.; see also *State* v. *Girolamo*, 197 Conn. 201, 206, 496 A.2d 948 (1985) (state conceded that two automatic handguns rightfully in defendant's possession improperly were admitted into evidence because they were completely irrelevant to guilt or innocence of defendant as to pending criminal charges).

In the present case, the state's theory was that the defendant, not Bennett, shot and killed the victim and shot at Caffrey. The state presented the firearm recovered from Bennett's apartment, which contained Bennett's DNA, but not the defendant's. Forensic testing established that this firearm was not discharged in the victim's apartment. Finally, at the defendant's trial, Bright was unable to identify the firearm as anything more than a small black gun. Her testimony regarding the firearm, general and nonspecific in nature, could not link the firearm seized from Bennett's apartment to crimes charged by the state against the defendant. Absent any connection between the firearm and the crimes charged, the court improperly admitted it into evidence because the state failed to establish its materiality. See *State* v. *Mozell*, supra, 36 Conn. App. 677; see also *State* v. *Johnson*, 160 Conn. 28, 30–33, 273 A.2d 702 (1970) (state failed to connect dynamite seized from defendants with dynamite stolen from construction site); *State* v. *Coleman*, supra, 35 Conn. App. 285–87.

### B

We now turn to the question of whether the improper admission of the firearm into evidence amounted to harmful error. See *State* v. *Michael A.*, 99 Conn. App. 251, 270, 913 A.2d 1081 (2007) (Appellate Court's inquiry does not end with conclusion of improper evidentiary ruling). We begin by setting forth the relevant legal principles. "[T]he appellate harmless error doctrine is rooted in [the] fundamental purpose of our criminal justice system—to convict the guilty and acquit the innocent. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (Citation omitted; internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 354–55, 904 A.2d 101 (2006), overruled in part on

other grounds by *State* v. *DeJesus*, 288 Conn. 418, 454–55 n.23, 953 A.2d 45 (2008) (en banc); see also *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010). When an improper evidentiary ruling is nonconstitutional in nature, it is the defendant's burden to demonstrate that such an error was harmful. *State* v. *Franko*, 142 Conn. App. 451, 460, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013); *State* v. *Outlaw*, 108 Conn. App. 772, 785, 949 A.2d 544, cert. denied, 289 Conn. 915, 957 A.2d 880 (2008); see also *State* v. *Jacobson*, supra, 283 Conn. 641.

In *State* v. *Sawyer*, supra, 279 Conn. 331, our Supreme Court clarified the standard for establishing harm in cases involving improper evidentiary rulings that are nonconstitutional in nature. After reviewing federal and sibling state authority, the court instructed that "the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. This is consistent with the outcome determinative approach followed by the overwhelming majority of state and federal courts because it expressly requires the reviewing court to consider the effect of the erroneous ruling on the jury's decision. . . . We also adopt the standard expressed in *Kotteakos* [v. *United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)] and followed by the [United States Court of Appeals for the] Second Circuit, namely, fair assurance . . . as the appropriate level of confidence for assessing whether the erroneous ruling substantially affected the verdict. Accordingly, we conclude that a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Sawyer*, supra, 357.

In order to determine whether the defendant in *Sawyer* satisfied his burden of establishing harmful error, the court set forth a number of factors, "such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id., 358; see also *State* v. *Jacobson*, supra, 283 Conn. 641–42; *State* v. *Ritrovato*, 280 Conn. 36, 56–57, 905 A.2d 1079 (2006); *State* v. *Outlaw*, supra, 108 Conn. App. 785–86; *State* v. *Michael A.*, supra, 99 Conn. App. 270–71.

In the present case, Bright testified that when the victim went to see who was at the door at approximately 1:15 a.m., he turned on lights in their apartment as

he walked from the bedroom. She overheard a brief conversation, and then a gunshot. She testified that two men, each holding a small black gun, entered the bedroom. A few days later, she recognized the defendant in a photographic array as the man wearing the tan sweatshirt who looked in the dresser for money and marijuana. She also identified the defendant in court. Caffrey, both in a photographic array a few days after the homicide and in court during the defendant's trial, identified the defendant as the individual wearing a tan sweatshirt who had shot at her in the victim's apartment. The jury heard testimony that the defendant had been in the victim's apartment and purchased marijuana from the victim the day before the shooting.[7] As a result of this transaction, he knew that the victim kept his supply of marijuana in the bedroom. The state read to the jury the defendant's statement to the police that he was in Bridgeport on the night when the victim was killed. This statement was contradicted, however, by evidence from cell phone towers that the defendant traveled from Bridgeport to Waterbury, was in Waterbury at the time of the shooting, and then went back to Bridgeport.[8] The jury heard from Earl Cornish, a jailhouse informant, who testified that the defendant previously had admitted to participating in the shooting of the victim.[9] Finally, the jury heard Latisha Caban's statement to the police, admitted pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Caban stated that the defendant had told her that he was going to Waterbury to "take some weed." She further stated that he returned to Bridgeport at approximately 2 a.m., and he told her that "it wasn't good, nothing happened and not to ask any questions."

On the basis of the weight of the evidence in this case, we cannot conclude that the verdict was substantially swayed by the improper admission of the firearm into evidence. In the present case, there were two eyewitnesses to the defendant's participation in the criminal activity in the victim's apartment. Additionally, the jury heard the testimony from a jailhouse informant who relayed inculpatory statements made by the defendant in which he admitted to robbing and shooting the victim. See *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2008) (overwhelming weight of evidence where two eyewitnesses saw defendant point gun at victim's car at time of shooting and state presented testimony of jailhouse informant that defendant confessed to fatally shooting victim); *State* v. *Rosario*, 99 Conn. App. 92, 115–16, 912 A.2d 1064 (state's case was strong when it presented three eyewitnesses who testified unequivocally that defendant was shooter), cert. denied, 281 Conn. 925, 918 A.2d 276 (2007); *State* v. *Thomas*, 98 Conn. App. 384, 388, 909 A.2d 57 (2006) (Appellate Court possessed fair assurance that any error did not substantially affect verdict in light of ample evidence of defen-

dant's guilt, including testimony from jailhouse informant), cert. denied, 281 Conn. 906, 916 A.2d 47 (2007); cf. *State* v. *Arroyo*, 284 Conn. 597, 614, 935 A.2d 975 (2007) (state's case was weak where primary evidence was testimony and out-of-court statement from five year old victim to third parties and equivocal medical evidence); *State* v. *Ritrovato*, supra, 280 Conn. 57 (sexual assault case lacking physical evidence, was weak especially when victim is minor).

After reviewing the relevant case law and the evidence in the present case, we conclude that the defendant has failed to sustain his burden of establishing harmful error.[10] More specifically, given the other evidence in the case, we have a fair assurance that the admission of the firearm, although improper, did not substantially affect the verdict.

## II

The defendant next claims that the court improperly admitted into evidence the testimony and the written statement of Bessie Pettway, who was the girlfriend of Bennett. Specifically, the defendant argues that the court should not have admitted her testimony and prior written statement to the police, pursuant to *State* v. *Whelan*, supra, 200 Conn. 753, regarding the firearm seized from Bennett's apartment and certain drug evidence. The defendant contends that his claim is comprised of both evidentiary and constitutional components. The state counters, inter alia, that any error was harmless. We agree with the state that any error was harmless beyond a reasonable doubt.

The following facts and procedural history are necessary for our analysis. Outside of the presence of the jury, the defendant objected to Pettway's testimony. Defense counsel stated to the court: "It is kind of an extension on the matter of the [firearm]. This was a matter that, basically, evidence she's going to testify to refers to . . . Bennett [and] not [the defendant]. Since we do not represent . . . Bennett, I have really no real basis for cross-examining her on what issues that she's going to testify to as far as [the defendant]." The court inquired: "So, your objection is that this relates to the gun evidence, primarily," and counsel responded: "Relates to the gun evidence, but I think [the state] is going to get into other areas also. . . . Concern is, again, it's cumulative because of the gun." Defense counsel noted that Pettway's testimony was cumulative, and then agreed with the court that one issue was that while the firearm was found in Bennett's apartment, other people in that apartment had access to it. Counsel also raised a claim that while Pettway's statement to the police indicated that she had seen Bennett with the firearm, at Bennett's criminal trial she testified that it belonged to someone else. Counsel then explained his objection as follows: "I can cross-examine her about that statement, but there are also other questions that

[the prosecutor] intends to elicit regarding timing, when [Bennett] came home and things like that. I don't have information that's privy to . . . Bennett to cross-examine her on. Could [Bennett] have been doing this, doing that? I'm kind of here with my hands tied to some extent, not knowing anything, any of the details about . . . Bennett. I never talked to the man, and we don't have access to him because he's represented by counsel."

At the outset of her testimony before the jury, Pettway indicated that she was "not happy" to be there, was incarcerated and faced felony charges. She stated that in October, 2008, she knew the defendant, and was in a relationship and lived with Bennett. Police searched their house and found the firearm. She testified that Bennett did not have "a gun like that" and that it belonged to her stepfather, Curtis Stevens. Pettway did not recall giving a statement to the Waterbury police that Bennett had a black gun, that she had seen Bennett with the firearm two months before, and that the only male clothes in the apartment belonged to Bennett. She testified that she had told the police that Bennett returned home after 2 a.m. on the day of the shooting and "that he was acting kind of nervous." She denied telling the police that Bennett sold crack and that they never sold marijuana.

At the conclusion of Pettway's testimony, the state indicated that it would attempt to introduce her prior written statement to the police for substantive purposes pursuant to *State* v. *Whelan*, supra, 200 Conn. 753. The state recalled Milford Hayes, a police detective, who had interviewed Pettway during the course of the investigation of the shooting of the victim. He stated that after speaking with Pettway, her statement was typed, printed and given to her to read and sign. Defense counsel then renewed his objection, and the court then admitted Pettway's statement to the police, which was read to the jury: "I mean me and [Bennett] sell crack, we never sell weed. [Shortly after the shooting, Bennett] kept telling me to mind my business. Detective Hayes then asked me if I ever seen [Bennett] with a gun, and I said yes [Bennett] has a black gun that looks a little like [Hayes'] but is smaller. I told . . . Hayes that [Bennett] let me hold the gun in my hand before. . . . Hayes asked me if I had any other males clothes in my apartment, no, only [Bennett's] stuff at this time." (Internal quotation marks omitted.)

On appeal, the defendant argues that Pettway's testimony regarding the presence of the firearm in Bennett's apartment was cumulative and unnecessary, Pettway's statement to the police admitted pursuant to *State* v. *Whelan*, supra, 200 Conn. 753, contained irrelevant firearm and drug evidence that was not connected to the defendant, and the admission of Pettway's testimony and statement to the police violated his sixth amend-

ment right to confrontation.[11] Even if we assume, without deciding, that the court's admission of Pettway's testimony and statement to the police was an abuse of discretion and violated the defendant's sixth amendment right, we conclude that any error was harmless beyond a reasonable doubt. See *State* v. *William L.*, 126 Conn. App. 472, 480, 11 A.3d 1132, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

"Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Santos*, 146 Conn. App. 537, 545, 78 A.3d 230 (2013); see also *State* v. *Devalda*, 306 Conn. 494, 506, 50 A.3d 882 (2012) (test for determining whether constitutional impropriety is harmless is whether it appears beyond reasonable doubt that impropriety did not contribute to verdict obtained). The state bears the burden of proving that the error is harmless beyond a reasonable doubt. *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008).

Under the factors applied in part I B of this opinion, we conclude that the state has sustained its burden of proving that any error relating to the admission of Pettway's testimony or statement to the police was harmless beyond a reasonable doubt. In light of the other evidence in this case, we conclude that the impact of Pettway's testimony and statement to the police was minimal with respect to the jury and its verdict. Under the facts and circumstances of this case, those factors also lead us to the conclusion that the admission of "collateral firearm and drug evidence" in Pettway's *Whelan* statement was harmless beyond a reasonable doubt. Furthermore, "because constitutional error claims are subjected to a stricter harmless error standard than nonconstitutional evidentiary claims, our conclusion that the trial court's preclusion of the cross-examination, if improper, was nevertheless harmless necessarily compels us to conclude that it was likewise harmless under a nonconstitutional evidentiary analysis." *State* v. *Wilson*, 308 Conn. 412, 422, 64 A.3d 91 (2013). Accordingly, we conclude that the defendant's evidentiary and constitutional claims must fail.

III

The defendant's final claim is that he was denied the right to a fair trial as a result of prosecutorial impropriety. Specifically, he argues that the prosecutor made five statements during his closing argument to the jury that were improper and that these remarks deprived the defendant of his right to a fair trial. We conclude that the challenged statements of the prosecutor were not improper and, therefore, we reject the claim that the defendant was denied his right to a fair trial.

As a preliminary matter, we set forth the relevant law on prosecutorial impropriety. The defendant acknowledges that he did not raise an objection during or following the prosecutor's closing argument. It is well established law, however, that "a defendant who fails to preserve claims of prosecutorial misconduct need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012); see also *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004); *State* v. *Adams*, 139 Conn. App. 540, 548, 56 A.3d 747 (2012) (claim of prosecutorial impropriety may be raised on appeal even if it was not subject of defense objection at trial), cert. denied, 308 Conn. 928, 64 A.3d 121 (2013). Our Supreme Court has explained that "the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time. . . . With this maxim in mind, we proceed with our review of the defendant's claim[s]." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 612–13, 65 A.3d 503 (2013).

"In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] [was harmful and thus] caused or contributed to a due process violation is a separate and distinct question . . . ." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Wilson*, supra, 308 Conn. 434;

see also *State* v. *Adams*, supra, 139 Conn. 548. We note that "[w]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *James*, 141 Conn. App. 124, 140, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013).

The improprieties alleged by the defendant occurred during closing argument. "As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 611–12. Guided by these principles, we turn to the specific claims of the defendant.

A

The defendant first argues that the prosecutor improperly vouched for the credibility of Caffrey and Bright. This statement came during the prosecutor's rebuttal remarks to the jury. The prosecutor, after responding to defense counsel's remarks on the defendant's expert witness on eyewitness identification, Stephen Penrod, then stated: "But Dr. Penrod didn't come in here and say . . . Bright [and] Caffrey made a mistake. He can't say that. And most of the time, people completely get it right. And how do you differentiate? How do you put that into context? That's why I'm spending some time on what I call corroboration. That's why you spend time on these details that don't seem important to you at the time. . . . That's what a trial is. All these pieces of evidence, all these pieces of fact. They are all pieces to the puzzle. When you get down to the end of it, yeah, there may be a couple of pieces in the middle of the sky or the middle of the sea or the middle of the forest that are missing, but that doesn't mean—you got the whole picture. That's why when the judge gives instruction, it's not beyond all doubt, beyond [a] shadow of a doubt, it's a reasonable doubt. And the state submits to you, there is no reasonable probability that this happened any other way than the way the evidence came in. That . . . *Caffrey in the kitchen got it right*. That when . . . Bright saw those people come into her room and saw [the defendant] with a gun, the man in the khaki colored T-shirt, she got it right. *When she heard Bennett's voice, she got it right*. And that when they come to court and look at him and pointed at him and said, yes, that's the man that was in the kitchen, they got it right. And there is nothing you've heard to tell you that they got it wrong. Dr. Penrod can talk about a lot of things, but he can't tell you that. And if you look at all of the corroboration that's in this case, all of the different factors, all the different evidence before you, there is no possible doubt we have proved this case beyond a reasonable doubt." (Emphasis added.)

"[Although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . This court has held that it is not improper for a prosecutor to offer an opinion when commenting on evidence that supports the credibility of a witness. . . . A prosecutor may contend that testimony is truthful because it is corroborated by the other evidence in the case. . . . Furthermore, a prosecutor may properly comment on the credibility of a witness where the comment reflects reasonable inferences from the evidence adduced at trial. . . . It is not improper for the prosecu-

tor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citations omitted; internal quotation marks omitted.) *State* v. *Barry A.*, 145 Conn. App. 582, 599, 76 A.3d 211, cert. denied, 310 Conn. 936,       A.3d      (2013); see also *State* v. *Pereira*, 72 Conn. App. 107, 126, 806 A.2d 51 (2002) ("This court has held that it is not improper for a prosecutor to offer an opinion when commenting on evidence that supports the credibility of a witness. . . . Furthermore, a prosecutor may properly comment on the credibility of a witness where the comment reflects reasonable inferences from the evidence adduced at trial." [Citations omitted; internal quotation marks omitted.]), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003).

During the prosecutor's argument to the jury and prior to the two statements challenged by the defendant, the prosecutor reviewed all of the evidence in support of the state's theory of the case. The prosecutor then argued, on the basis of all those combined pieces of evidence, that the testimony of Bright and Caffrey was credible, despite the testimony of Penrod. Because the prosecutor's argument that Bright and Caffrey "got it right" was based on and linked to the evidence, we conclude that it was proper.

B

The defendant also argues that the prosecutor improperly opined on the credibility of Cornish, the jailhouse informant. Specifically, the defendant challenges the following statement as an instance of prosecutorial impropriety: "But it was kind of insightful in the couple of minutes that . . . Cornish was on the [witness] stand. *This is why I think it was insightful.* He's already sentenced. He is doing his time. . . . [The] defendant comes in here, he's got a little paperwork. He starts talking about things that [the defendant] wants to talk about, military time. He wants to know about cell phone towers. He wants to know about identification procedure. He's talking about how can I beat my case? How do you beat your case? That kind of sounds like the conversation you had. . . . That particular period, Cornish, [the defendant], they were there in that place. They both had cases. They were talking about it. Okay. What Cornish had to say is corroborative in a general way of what the facts are in this case. That's why I didn't—it is what it is. He's a sentenced prisoner. Is that what the conversation was? You are going to decide that. You are going to decide if it's important or how important. It is just another piece of the puzzle about another way we're trying to tell you that it's more than

just two identifications." (Emphasis added.)

On the basis of the law set forth in part III A of this opinion, we conclude that the statement that Cornish's testimony was "insightful" was linked to the evidence in the case, and therefore did not amount to improper vouching by the prosecutor.

C

The defendant next argues that the prosecutor improperly denigrated the closing argument of defense counsel. At the conclusion of his argument to the jury, defense counsel stated: "There were a lot of people in Waterbury. [The defendant] knew where [the victim] kept his drugs, so did [Rufus] Weathersby. I'm not saying . . . Weathersby did it. We never found out anything about him except for one thing. He and another individual, black individual, at the time of the murder were driving around Waterbury, supposedly smoking [marijuana]. They may have been with . . . [Orzuna-Sanchez] or not been depending on whether you believe her time frame. She said, picked up by them sometime around midnight. We continued going around smoking [marijuana]. Is that ever checked out? No. Because by that time, they had decided it was [the defendant] and . . . Bennett because who—why would they be in Bridgeport—to come from Bridgeport. It has to be."

The prosecutor began his rebuttal argument to the jury by stating: "Police didn't concentrate on anybody. They started talking to the people in the apartment. They talked to all the people in the apartment. . . . Detective [George] Tirado told you, we talked to everybody. Only guy we didn't know was, who was this black guy from Bridgeport named T? So, to get up and say that Rufus Weathersby never got spoken to, you draw your own conclusions. . . . There's no evidence that anybody else, Rufus Weathersby or anybody, did anything in this case. *That is just a red herring to have you chase off into the distance.*" (Emphasis added.)

The defendant argues that the prosecutor's red herring comment "suggested to the jury that the defendant's lawyer was using smoke and mirrors to divert their attention away from the real evidence in the case."[12] As an initial matter, we note that "[t]here is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." (Internal quotation marks omitted.) *State* v. *Dearing*, 133 Conn. App. 332, 352, 34 A.3d 1031, cert. denied, 304 Conn. 913, 40 A.3d 319 (2012). Furthermore, "[t]here is a distinction between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . A red herring is defined in relevant part as a diversion intended to distract attention from the real issue . . . Webster's Third New International Dic-

tionary." (Citations omitted; internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 558–59, 949 A.2d 1092 (2008), overruled in part on other grounds by *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009).

Given the circumstances in which the prosecutor in this case, responding to the argument of defense counsel that a third party may have been the actual perpetrator of the crimes in this case, used the rhetorical phrase red herring, we conclude that it was proper. We also note that the prosecutor, before using that phrase, pointed to the evidence in the case to contradict defense counsel's suggestion to the jury that the police investigation purposefully excluded other possible suspects. See *State* v. *Dearing*, supra, 133 Conn. App. 353. We conclude, therefore, that this statement did not constitute prosecutorial impropriety.

D

The defendant next argues that the prosecutor interjected facts that were not in evidence during his closing argument. The prosecutor referred to the testimony of Caban during his initial argument to the jury. In Caban's *Whelan* statement, she had stated that on the night of the killing, the defendant left with a "BB" gun, went to Waterbury, and upon his return, attempted to fix the BB gun with the defendant and another individual. Then the prosecutor commented: "Even four year old kids minimize their involvement in things. Even four year old kids know how to do that. . . . Caban did, too. BB gun, can't get in trouble. Well, give [the defendant] a BB gun, that's the gun they had. *Whatever they did with that gun in Bridgeport hours after that shooting, I suggest to you it was more about getting rid of the gun or breaking the gun so it couldn't be found, couldn't be tested, couldn't be found operable, couldn't link [the defendant] to that poor young man in Waterbury lying dead in his hallway.*" (Emphasis added.)

The defendant argues that there was no evidence as to what happened to the firearm used to kill the victim and, therefore, it was improper for the prosecutor to suggest that the defendant destroyed or disposed of it. "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 33, 66 A.3d 520 (2013). Nevertheless "jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to

a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Jordan*, 132 Conn. App. 817, 831, 33 A.3d 307, cert. denied, 304 Conn. 909, 39 A.3d 1119 (2012).

It was the state's theory that the "BB gun" actually was the firearm used to kill the victim, and that rather than repairing it, the defendant was attempting to damage the firearm to prevent it from being tested and connected to the death of the victim. Furthermore, the state argued that Caban, who had testified that the defendant was "like a brother" to her, had tried to minimize his involvement in the actions on the night of the shooting. We conclude, therefore, that the challenged argument by the prosecutor was an appeal to the jury's common sense and, thus, did not constitute prosecutorial impropriety.

E

The defendant next argues that the prosecutor improperly appealed to the jury's sympathy when referring to the victim as "poor young James Caffrey" and the "poor young man in Waterbury lying dead in his hallway" during initial argument to the jury.[13]

"[I]t is well established that, [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citation omitted; internal quotation marks omitted.) *State* v. *Crump*, 145 Conn. App. 749, 755, 75 A.3d 758, cert. denied, 310 Conn. 947,      A.3d      (2013); see also *State* v. *Bermudez*, 274 Conn. 581, 595–96, 876 A.2d 1162 (2005), aff'd after remand, 95 Conn. App. 577, 897 A.2d 661 (2006).

The challenged comments in this case do not approach the level of those in *State* v. *Payne*, 260 Conn. 446, 797 A.2d 1088 (2002),[14] *State* v. *Santiago*, supra, 143 Conn. App. 41,[15] *State* v. *Montoya*, 110 Conn. App. 97, 107–108, 954 A.2d 193, cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008),[16] or *State* v. *Mills*, 57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000),[17] where this court and our Supreme Court concluded that the statements at issue were improper. Additionally, the comments in this case were based on the evidence; see *State* v. *Peeler*, 267 Conn. 611, 641, 841 A.2d 181 (2004) (as state's advocate, prosecutor may argue state's case forcefully, so long as argument is fair and based upon facts in evidence and reasonable inferences to be drawn therefrom); i.e., the victim was a young adult and his demise was unfortunate under these facts and circumstances. Finally, we

agree with the state that, under the facts and circumstances of this case, the two comments at issue were nothing more than a "permissible rhetorical flourish." *State* v. *Edward M.*, 135 Conn. App. 402, 417, 41 A.3d 1165, cert. denied, 305 Conn. 914, 46 A.3d 172 (2012). For all these reasons, we conclude that the state's infrequent description of the victim in this case did not constitute prosecutorial impropriety.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] A three judge panel unanimously found Bennett guilty of felony murder, home invasion and burglary in the first degree. *State* v. *Bennett*, 307 Conn. 758, 760, 59 A.3d 221 (2013). A majority of the panel found Bennett guilty of aiding and abetting murder in violation of General Statutes §§ 53a-8 and 53a-54a. Id. On appeal, our Supreme Court concluded that the evidence was insufficient to support Bennett's conviction of aiding and abetting murder. Id., 760–61.

[2] Frank Evangelista, an associate medical examiner for the state, testified that the victim had an entrance gunshot wound in the mid-bridge of his nose and gunpowder stippling on the skin of his face, which indicated that the muzzle of the gun was one to three feet from the victim when he was shot. Evangelista recovered the bullet, which had fractured the bones in the victim's face, in the back of the victim's neck.

[3] The defendant's motion specifically objected to the introduction of the firearm into evidence, any mention to the jury of the existence of the firearm and any showing of the firearm for identification during the trial.

[4] Defense counsel also agreed with the court's summary of his argument. The court stated to defense counsel: "Your claim about the tenuous ties between that gun and this crime relates to how probative the evidence is because, as I understand your point, it is that because they can't clearly tie the gun to the apartment, the actual gun used in the commission of a crime here, that it's not probative, it's not helpful to the jury. That's a probative value argument."

[5] During Rainone's testimony, the court admitted the firearm into evidence as a full exhibit over the defendant's continuing objection.

[6] "See *State* v. *Marra*, 222 Conn. 506, 610 A.2d 1113 (1992) (witnesses testified that sneaker found in Long Island Sound was identical to one victim was wearing when he was assaulted by defendant); *State* v. *Jeffrey*, 220 Conn. 698, 704, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992) (urine stained blouse worn by victim admissible where victim testified that defendant urinated on her during sexual assault); *State* v. *Thomas*, [205 Conn. 279, 283, 533 A.2d 553 (1987)] (witness testified that clothesline rope seized from defendant's basement looked like rope used in crime charged); *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987) (evidence that handcuffs found on victim were same brand as those shipped to federal correctional institution where defendant had been previously employed); *State* v. *Villafane*, [171 Conn. 644, 675, 372 A.2d 82 (1976)] (crime charged was committed with handgun and defendant admitted to possession of handgun one day after shooting) [cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds by *State* v. *Stepney*, 191 Conn. 233, 254, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984)]; *State* v. *Ortiz*, 14 Conn. App. 493, 499–500, 542 A.2d 734 (1988) (witness testified that he was beaten with stick and stick was found near crime scene); *State* v. *Corbett*, [12 Conn. App. 217, 220, 530 A.2d 208 (1987)] (shotgun shells and pellets seized from defendant's bedroom were kind used in crime charged)." *State* v. *Coleman*, supra, 35 Conn. App. 286–87.

[7] Orzuna-Sanchez testified that at the time the defendant purchased marijuana from the victim, he was wearing a tan hooded sweatshirt.

[8] Dan Jensen, an employee of Sprint Nextel, reviewed the defendant's cellular telephone records and the Nextel telephone records. By analyzing the specific access control gateways, which are located on cellular towers and sites, that picked up the calls from the defendant's cell phone, Jensen was able to trace the defendant's movements on the night in question.

[9] Specifically, Cornish testified: "[The defendant] told me that he was looking for some marijuana. The girl that he was messing with out in Waterbury said she knew somebody who has some marijuana. They went to the

kid's house, sold him some marijuana. He asked the kid if he could get some weight, meaning more, like bigger amounts. The kid said yes. And he decided he was going to rob him. So, he went back to Bridgeport, where he's from, tried to get a gun, ended up getting a gun from somebody he referred to as his neighbor, at first. Then he told me the kid's name was Cal. They went back together and robbed the kid—well, knocked on the door, shot him—rang the doorbell, shot him in the face and then robbed him."

[10] In his brief, the defendant primarily relies on *State* v. *Girolamo*, supra, 197 Conn. 201, *State* v. *Onofrio*, 179 Conn. 23, 425 A.2d 560 (1979), and *State* v. *Ferraro*, 160 Conn. 42, 273 A.2d 694 (1970), for his claim that admission of the firearm constituted harmful error. In *State* v. *Girolamo*, supra, 202–203, the defendant was convicted of two counts of theft of a firearm and larceny in the fourth degree by receiving stolen property. The court improperly admitted two automatic handguns into evidence. Id., 206. These two automatic handguns were not related to the charges against the defendant and were seized during the execution of a search warrant for the defendant's home. Id., 207. Our Supreme Court determined that it could not conclude that the evidentiary error was harmless because "the sight of deadly weapons . . . tends to overwhelm reason and to associate the accused with the [crime] without sufficient evidence . . . especially in view of the irrelevance of the two automatic guns to the charges against the defendant . . . ." (Citation omitted; internal quotation marks omitted.) Id., 208.

In *State* v. *Onofrio*, supra, 179 Conn. 25, the defendant was convicted of manslaughter in the first degree following the death of the victim from multiple gunshot wounds. During the defendant's trial, the state introduced into evidence two photographs of rooms in his home with rifles, a pistol and a holster. Id., 27. Our Supreme Court concluded that these photographs were harmful because "[a]t the very least the jury could have believed that the defendant was a violent individual." Id., 33.

In *State* v. *Ferraro*, supra, 160 Conn. 43, the defendants and another man violently assaulted the victims in their home while wearing ski masks and while two of the assailants were holding guns. During the trial, the court admitted evidence consisting of pistols, ammunition and a ski mask seized from the apartment of an alibi witness under the conditions that these items would be connected to the charges against the defendants. Id., 44. The state, however, failed to meet the condition on which these items were admitted into evidence because there was nothing in the record to connect the items with the events underlying the charges against the defendants. Id., 44–45. In concluding that the admission of this evidence was harmful, our Supreme Court noted: Here, the jury had before them evidence that the defendants had been living in an apartment where pistols, ammunition and a ski mask were found by the police concealed in the ceiling above a closet. At the very least the jury could have believed that these defendants were violent individuals." Id., 45–46.

The cases cited by the defendant are factually distinguishable from the present case. They also predate *State* v. *Sawyer*, supra, 279 Conn. 331, and therefore did not employ the standard and address the specific factors *Sawyer* established for determining harmless error. Given the nature of the crimes in the present case, and the testimony and other evidence presented by the state, we conclude that the physical presence of the firearm was harmless error.

[11] "The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 816, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "We have long recognized that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . ." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 420, 64 A.3d 91 (2013).

[12] In *State* v. *Orellana*, 89 Conn. App. 71, 103, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005), we concluded that the "smoke and mirrors" component of the argument by a prosecutor "was improper because it implied, to whatever degree, that the defendant's attorney had not based his argument on fact or reason, but had intended to mislead the jury by means of an artfully deceptive argument. The prosecutor implied that the defendant's attorney intended to deceive and thereby impugned the integrity of the defendant's attorney. For that reason, the argument constituted prosecutorial [impropriety]." See also *State* v. *Serrano*, 91 Conn. App. 227, 237–38, 880 A.2d 183, cert. denied, 276 Conn. 908, 884 A.2d 1029 (2005). We note

that the prosecutor in this case did not use the phrase "smoke and mirrors."

[13] Specifically, the challenged statements from the prosecutor were made in the following context of his argument to the jury: "Sergeant Rainone took the two casings, said, eject them, marks are similar from the same gun. Looked at the other markings on the casings, these two shots came from the same gun. And we know it wasn't [Bennett's] gun. Process of elimination. This is where the inference is. Kept waiting for someone to come in . . . Bennett's gun is the gun that fired the shot, *that's the gun that killed poor young James Caffrey*, but all of that evidence was to prove something in the negative. . . . Bennett's gun is not the gun that fired the fatal shot. It was a gun held by the other person. And the other person is [the defendant]. Look at corroboration." (Emphasis added.)

The prosecutor subsequently stated: "Whatever they did with that gun in Bridgeport hours after that shooting, I suggest to you it was more about getting rid of the gun or breaking the gun so it couldn't be found, couldn't be tested, couldn't be found operable, couldn't link [the defendant] to that *poor young man* in Waterbury lying dead in his hallway." (Emphasis added.)

[14] In *Payne*, the prosecutor argued: "Ask yourselves, is that what our law is all about here? Are victims of crime going to have to continually defend themselves, their family, their friends from the grave? Because we all know that is impossible. [The victim] doesn't deserve to be treated like that in life or in death. His name [besmirched, his family besmirched] mudslinging. He can't defend himself. And the defendant, the defendant knows that. That's why we heard the stories we did. All his family has left is his picture. Now on a slab, on a cutting board. Let them have, let them, let his family come away from this trial with one good thing out of it. They heard a lot of negative things in this trial, a lot of accusations that have not been proven against him, his friends, his family. Let them come away with one positive thing. Let them have a memory of [the victim] that they can go back home with. Let them come away with a guilty verdict against the person that put a twenty-five caliber bullet into his body." (Internal quotation marks omitted.) *State* v. *Payne*, supra, 260 Conn. 461–62.

[15] In *Santiago*, the prosecutor "argued that your verdict should speak for [the victim]. Your verdict should shout out for justice for him and his family. It's the defendant, the defendant sitting there, who put in motion the plan that resulted in [the victim] being shot through the heart on his doorstep while his wife was asleep inside. [The prosecutor] further argued to the jury: [W]e throw around words like the body and talk about the body laying in the road, [but] he was a man who was shot and killed. There are sons who lost a father and there's a wife who lost a husband. Don't—lose sight of that because of this sterile environment. Finally, [the prosecutor] told the jury: [I]f you don't feel sad for [the victim], you're not human, right; he didn't deserve to be shot and killed." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 143 Conn. App. 40.

[16] In *Montoya*, the prosecutor argued: "She has lost trust. Didn't she say she was heartbroken? She has lost trust, she has lost innocence. Hasn't she lost some happiness, too? Hasn't she lost some inner peace? She's sixteen years old, she testified she's on antidepressants. Lost, lost, lost, lost. All lost to this man. To this man, who—you know, we'll never know why. Whether it was some sort of horrible plan or if this was just some sudden lapse of really bad judgment. In those few moments, the state argues that she lost all those things to this man. Although some portions of the prosecutor's comments in this instance were related to [the victim's] testimony regarding the impact of the assault on her, we agree with the defendant that the comments of the prosecutor went too far.

"Although [the victim] testified at trial that the defendant's actions left her heartbroken and that she was still taking antidepressants, the prosecutor put an overly dramatic gloss on this testimony by painting a picture of the victim with such emotionally laden words as innocence, happiness and inner peace and through her repeated use of the word lost. Even though the prosecutor's statements were grounded in evidence, her language invoked overly sympathetic images of the victim that improperly appealed to the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Montoya*, supra, 110 Conn. App. 107–108.

[17] "The prosecutor in [*State* v. *Mills*, supra, 57 Conn. App. 209–11, 210 n.14] argued to the jury that the state and the victim wanted justice and justice required a conviction for murder, the victim was not going to be a nameless, faceless, slab of meat on an autopsy table, and the victim could not come to court to tell his story." *State* v. *Santiago*, supra, 143 Conn. App. 41.